UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:24-CR-22 CCB |
| | ) | |
| ANTONIO CURIEL | ) | |

# UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

Comes now the United States of America, by its counsel, Clifford D. Johnson, United States Attorney for the Northern District of Indiana, through Joel Gabrielse, Assistant United States Attorney, and responds in opposition to defendant Antonio Curiel's motion to suppress (DE 21) filed August 9, 2024.

## Summary of Facts

At approximately 8:06 AM on March 20, 2024, Sgt. Wade Wallace of the LaPorte County Sheriff's Department was monitoring eastbound traffic on the Indiana Toll Road. He saw an orange SUV traveling at what appeared to be a high rate of speed. He pulled out and began to follow the SUV, which was traveling above 77 mph in a 70-mph zone. Sgt. Wallace activated his emergency lights to perform a traffic stop; the SUV appropriately stopped in a parking area of a nearby toll plaza at approximately 8:09 AM.

Sgt. Wallace approached the SUV on foot and found that the SUV was occupied by Mr. Antonio Curiel (driver), Ms. Jimena Llanes (front passenger), and Ms. Esmeralda Curiel (back passenger). Sgt. Wallace explained that he stopped

them for speeding. Although her window was down and it was 33 degrees (F), Ms. Llanes began fanning her face and breathing heavily.

Sgt. Wallace spent approximately 3 minutes by the SUV at this juncture. During this time, Mr. Curiel admitted that he had been exceeding the speed limit but said it was only "72 or 73" in the 70-mph zone. Sgt. Wallace repeatedly requested that Mr. Curiel provide his driver's license; Mr. Curiel said that he had one but handed over a California ID card and a Mexico ID card instead. Eventually Mr. Curiel admitted that he didn't have a valid driver's license. Ms. Llanes rummaged through various purses and bags but did not produce a license or ID.

The SUV was a rental vehicle, so Sgt. Wallace requested rental paperwork. Ms. Curiel was eventually able to find some of the information on her phone. That information showed that the SUV had been rented in California on March 17 and was due back in California on March 27.

Sgt. Wallace informed Mr. Curiel that he intended to run the information and then issue a warning ticket. He asked Mr. Curiel to come back with him to his police car. He offered to let Mr. Curiel sit in the front seat where it was warm, but Mr. Curiel said he preferred to stand outside so they conversed through the open window while Sgt. Wallace worked on his computer. Sgt. Wallace got back into his police car to begin this process at approximately 8:13:30 AM.

Sgt. Wallace began checking for license status and possible warrants, beginning with Mr. Curiel. He logged in, then began checking two different law

enforcement databases for this information. He then opened the "ECWS" system for issuing a warning ticket. He also ran the license plate of the vehicle.

While working on the computer, Sgt. Wallace conversed with Mr. Curiel. Mr. Curiel said that he was traveling from California and was "going back" to Boston. He said he was going there for a "little vacation" and was going to visit cousins. He said that the cousins were interested in moving to California so he was going to explain to them what it was like to live there.

Mr. Curiel also said that he didn't have a valid license because it had recently been suspended due to unpaid child support, with a balance of $250,000.

Many of these statements didn't make sense. Spending more than 40 hours of driving time (each way) was disproportionate to the amount of time that could be spent visiting. Driving cross-country to describe life in California seemed unnecessary and odd. Most significantly, Mr. Curiel's story about his license status appeared to be simply false: law enforcement records showed that he hadn't had a valid license since 2010, at which time it had expired.

During this time, Deputy Jon Samuelson arrived at the scene, along with his drug detection K-9. He approached the SUV and asked Esmeralda (the apparent renter of the SUV) if she would consent to a search. Her answers were equivocal, so Dep. Samuelson stopped seeking consent and simply asked her to get out of the vehicle so he could walk his K-9 around the outside. After she did so—and after some argument from Mr. Curiel—Dep. Samuelson had his K-9

perform a free-air sniff around the exterior of the SUV. At approximately 8:23:58 AM, Dep. Samuelson informed Sgt. Wallace that the K-9 had alerted on the SUV.

At the time that the K-9 alerted on the vehicle, Sgt. Wallace was still working on the warning ticket. He had not yet confirmed the driver's license status for either of the two female passengers.

When Sgt. Wallace was informed that the K-9 alerted on the SUV, he informed Mr. Curiel of that fact and told him that they would be conducting a vehicle search. He told Mr. Curiel, "I think you have something in there that you're not supposed to have." Mr. Curiel replied, "Yeah, I do."

After being informed of his *Miranda* rights, Mr. Curiel confessed that he was getting paid to transport cocaine, and he estimated that he had "more than 12" kilos of it.

The vehicle was searched, and police found 18 wrapped packages of cocaine totaling approximately 20 kilograms.

Mr. Curiel now seeks to suppress essentially all of the evidence against him.

**Based on Sgt. Wallace's Observations, the Traffic Stop was Valid**

Sgt. Wallace saw the SUV exceeding the posted speed limit. This infraction was a violation of I.C. 9-21-5-2(a)(6). By observing this traffic violation, Sgt. Wallace had authority to conduct a traffic stop on the SUV: "Even minor traffic violations can provide law enforcement officers probable cause to stop a vehicle." *United States v. Sanders*, 2020 WL 5877890, *3 (N.D. Ind. Oct. 2, 2020), citing *United States v. Lewis*, 920 F.3d 483, 489 (7th Cir. 2019); *Shorter v. State*, 144 N.E.3d 829, 836 (Ind. Ct. App. 2020). "If an officer reasonably thinks he sees a

driver commit a traffic infraction, that is a sufficient basis to pull him over without violating the Constitution." *United States v. Seay*, 2020 WL 5230693, *5 (N.D. Ind. Sept. 2, 2020), citing *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005). Indeed, the question is not whether a driver actually committed a particular traffic violation, but whether a police officer had probable cause to believe that he did. *See United States v. McDonald*, 453 F.3d 958, 960 (7th Cir. 2006). An officer's subjective motives for conducting a stop will not invalidate an otherwise valid stop. *Whren v. United States*, 517 U.S. 806, 812 (1996).

Sgt. Wallace saw what he believed to be a traffic violation and was therefore justified in stopping the SUV.

**<u>The Dog Sniff Procedure was Reasonable and Timely</u>**

Approximately 10 minutes after Sgt. Wallace returned to his police car to work on the computer, Dep. Samuelson and his K-9 partner approached the SUV together to begin a free-air sniff around the exterior. Within seconds after that, the K-9 signaled an alert. The K-9 sniff and alert occurred while Sgt. Wallace was still performing his duties relating to the traffic stop and the SUV's occupants.

During a traffic stop, a police officer may engage in some questioning and may exercise some control over the occupants of a car, even if such procedures are not strictly tied to the original traffic violation. For example, an officer may direct drivers and passengers to get out of the stopped vehicle. *Pennsylvania v. Mimms*, 434 U.S. 106 (1977); *Maryland v. Wilson*, 519 U.S. 408 (1997). An officer may run checks regarding the vehicle, the license status of individuals, insurance coverage,

and outstanding warrants. *Rodriguez v. United States*, 575 U.S. 348, 355 (2015), citing *Delaware v. Prouse*, 440 U.S. 648 (1979). Limited additional questioning is also permissible: "An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009); *accord United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005) (officer may ask a "moderate number" of questions even if those questions do not strictly "concern the purpose of the stop and that are not supported by any other suspicion").

It is also permissible for officers to spend a reasonable amount of time briefing additional backup officers who arrive at a scene. See *United States v. Williams*, 2021 WL 651350, *4 (N.D. Ind. 2021); (citing *United States v. Offord*, 788 Fed. Appx. 384, 387 (7th Cir. 2019) for the proposition that "time from the initial stop to the dog alert was not unreasonably prolonged when the trooper was processing the passenger's outstanding arrest warrant and briefing another officer who arrived on the scene.")

A dog sniff performed during a traffic stop comports with the Fourth Amendment. *Illinois v. Caballes,* 543 U.S. 405 (2005). Unless reasonable suspicion has been developed during the stop, however, a traffic stop may not be extended beyond its reasonable completion simply to allow a dog sniff to occur. *Rodriguez*, 575 U.S. 348.

Although there is no bright-line test to determine when an initially lawful traffic stop becomes unreasonably prolonged, it is clear that there was nothing facially problematic about the timeline of the traffic stop at issue in the present case. See, eg., *United States v. Offord*, 788 Fed.Appx. 384 (7th Cir. 2019)(drug K-9 alerted 13 minutes after traffic stop began); *United States v. Lewis*, 920 F.3d 483 (7th Cir. 2019)(using just under 11 minutes to complete paperwork and engage in additional questioning was permissible, with no unreasonable delay); *United States v. Sanford*, 806 F.3d 954, 956-57 (7th Cir. 2015)(26-27 minutes from initial traffic stop until a dog alerted).

Still, under *Rodriguez,* the constitutional analysis is focused on any unreasonable delay that extends the duration of the traffic stop, rather than on a simplistic comparison with other traffic stop timelines. The question in the present case, therefore, is whether the police unconstitutionally extended the traffic stop until the K-9 alerted on the SUV.

Because the K-9 alert occurred while Sgt. Wallace was still conducting his duties relating to the traffic stop and the occupants, the answer is that there was no unconstitutional extension. Because this traffic stop proceeded reasonably, and because the K-9 sniff test was performed reasonably and without prolonging the encounter, the defendant's claim that his Fourth Amendment rights were violated is unfounded.

**Reasonable Suspicion Independently Justified the K-9 Search**

A "traffic stop is more analogous to a so-called *Terry* stop . . . than to a formal arrest." *United States v. Yang*, 39 F.4th 893, 899 (7th Cir. 2022), citing *Rodriguez*, 575 U.S. at 354. See also *Terry v. Ohio*, 392 U.S. 1 (1968). As with all *Terry* stops, an officer's initial suspicions or motivations for initiating the stop can dissipate, remain unchanged but uncorroborated, or ripen into increased suspicion or even probable cause. Thus, a stop can be reasonably extended, and a K-9 may be requested and used if based on reasonable suspicion beyond the bare traffic infraction that justified the initial stop. "[W]ith independent reasonable suspicion, the officer may detain the suspect for the sniff even if the sniff adds time to the total stop." *United States v. Lewis*, 920 F.3d 483, 491 (7th Cir. 2019).

By the time that Sgt. Wallace walked back to his own police car after his initial approach to the SUV, he knew the following facts:

- The driver had initially claimed to have a driver's license, but then admitted that he did not have a license.
- The driver had ID cards from both California and Mexico. Both California and Mexico are "source locations" for a large percentage of the illegal drugs distributed throughout the United States.
- The SUV had traveled from California over approximately 3 days.
- The front seat passenger appeared unusually nervous.
- The front seat passenger was unable to produce any ID card, even though they were on a cross-country trip.

None of these factors was overtly criminal. Individually, they weren't even overtly suspicious. Together, however, they started to be consistent with cross-country drug trafficking patterns that Sgt. Wallace recognized from his experience.

Back at Sgt. Wallace's police car, his suspicions grew:

- Mr. Curiel's stated travel plans (driving from California to Boston and back within the constraints of the vehicle rental timeline instead of flying) didn't make sense if the primary purpose was legitimate travel—getting the occupants *themselves* across the country for a visit with extended family. Conversely, all that driving would make perfect sense if the primary purpose was to transport *something* that couldn't easily go through an airport.
- Mr. Curiel's statements appeared rushed and odd, as though being invented in the moment. He said that they were traveling "back" to Boston, although they were actually on a round trip from California. He said that they were planning to meet cousins to explain what life was like in California (rather than conversing by phone or having those cousins come to visit California, etc.).
- Mr. Curiel appeared to be inventing a false story about the status of his driver's license.

Under the totality of such conditions, Sgt. Wallace's suspicion that further investigation was warranted because criminal activity might be afoot was certainly reasonable. He was therefore justified in asking a few follow-up

questions while Dep. Samuelson was arriving with his K-9. Thus, even assuming *arguendo* that the traffic stop was somehow extended, the K-9 sniff was based on reasonable suspicion, and the approximately 10 ½ minute detention (from the time Sgt. Wallace returned to his car to the K-9's alert) was within acceptable *Terry* standards.

**The vehicle search was lawful**

After the K-9 alerted on the SUV, police conducted a search. It is undisputed that an alert from a qualified drug-detection dog provides probable cause to search a vehicle. See, eg., *United States v. Limares*, 269 F.3d 794 (7th Cir. 2001). Mr. Curiel's confession began when it became clear that the vehicle was going to be searched. The cocaine was discovered during that search. Because that search was lawful, the cocaine and the confession are admissible and there was no constitutional violation.

**Conclusion**

A law enforcement officer observed a traffic violation and performed a valid traffic stop. During the stop, the behavior and statements from the vehicle's occupants increased the police officer's suspicion that criminal activity could be underway. While that initial officer was performing the duties associated with the stop, a drug-detecting K-9 alerted on the stopped vehicle. Because the police actions to that point were reasonable and lawful, the resulting vehicle search was lawful. The defendant's motion to suppress evidence should be denied.

Dated: August 19, 2024.

Respectfully submitted,

CLIFFORD D. JOHNSON
UNITED STATES ATTORNEY

By: *s/ Joel Gabrielse*

Joel Gabrielse
Assistant United States Attorney
United States Attorney's Office
204 S. Main Street, Room M01
South Bend, IN 46601
Phone: (574) 236-8287
Email: Joel.Gabrielse@usdoj.gov